# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **STEVE ZACCONE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10 CV 00033** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **STANDARD LIFE INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

From 1990 to 2007, Steve Zaccone worked for Tempel Steel as a business support specialist. (Administrative Record ("R.") 00387). As a Tempel employee, he received both short-term and long-term disability insurance coverage through Standard Life Insurance Company ("Standard"). (R. 00382, 00494). On September 1, 2006, Mr. Zaccone stopped working. He had a history of back problems and, as it turned out, he did not return to work until February 13, 2007. Even then, he was only able to work part time. (R. 00378, 00479). By October 5, 2007, he had ceased work completely. (R. 00378, 00479). Standard determined that he was entitled to disability benefits but, as it turned out, only for a twelve-month period. In reaching this conclusion, Standard determined that Mr. Zaccone's back impairment – and the medical evidence he submitted to establish it – put him in the category of "Other Limited Conditions" as defined in the Group Plan. Mr. Zaccone disagrees with that result and filed suit hoping to overturn it.

The parties briefed the question of what standard applied to the review of Standard's benefits determination and, after considering their submissions, I concluded that the *de novo* standard applies. *Zaccone v. Standard Life Ins. Co.*, 2013 WL 1849515 (N.D.Ill. 2013). In such an instance,

the court "must come to an independent decision on both the legal and factual issues that form the basis of the claim." *Diaz v. Prudential Ins. Co. of Am.,* 499 F.3d 640, 643 (7th Cir.2007); *Marantz v. Permanente Medical Group, Inc. Long Term Disability Plan*, 687 F.3d 320, 328 (7th Cir. 2012). The court is, therefore, not really "reviewing" the insurance provider's determination; it is making an independent decision about the employee's entitlement to benefits. *Diaz*, 499 F.3d at 643; *Marantz*, 687 F.3d at 328. Of course, in doing so, the court must follow the terms of the insurance policy. *Sperandeo v. Lorillard Tobacco Co., Inc*., 460 F.3d 866, 872 (7th Cir. 2006).

The only issue here is whether Mr. Zaccone suffers from an "Other Limited Condition" as defined by the Group Plan. (Dkt. # 102, ¶ 86). If he does, he is only entitled to benefits for twelve months – benefits he has already received. The Group Plan states:

> Payment of LTD Benefits is limited to 12 months during your entire lifetime for a Disability caused or contributed to by any one or more of the following, or medical or surgical treatment of one of the following:
> …
> 3. Other Limited Conditions.
> …
> Other Limited Conditions means…chronic pain conditions…arthritis, diseases or disorders of the cervical thoracic, or lumbosacral back and its surrounding soft tissue…. However, Other Limited Conditions does not include…herniated discs with neurological abnormalities that are documented by electromyogram and computerized tomography or magnetic resonance imaging, scoliosis, radiculopathies that are documented by electromyogram, spondylolisthesis, grade II or higher, myelopathies and myelitis, traumatic spinal cord necrosis, osteoporosis, discitis, Paget's disease.

(Administrative Record ("R.") 00509-00510). Mr. Zaccone does have a back impairment, but under the applicable provision, the question is whether he has a disability caused or contributed  (1) herniated discs with neurological abnormalities that are documented by electromyogram and computerized tomography or magnetic resonance imaging; and/or (2) radiculopathies that are documented by electromyogram.

Generally speaking, the party seeking benefits bears the burden of proving his entitlement to benefits. *Ruttenberg v. U.S. Life Ins. Co. in City of New York, a subsidiary of American General Corp.*, 413 F.3d 652, 663 (7th Cir. 2005). That's the case here as well, for although an insurer like Standard has the burden of proving an exclusion applies – here, the "Other Limited Conditions" provision – the insured, in turn, has the burden of proving that an exception to the exclusion restores coverage. *Santa's Best Craft, LLC v. St. Paul Fire and Marine Ins. Co.*, 611 F.3d 339, 347 (7th Cir. 2010).

## I.

### The Administrative Record

### A.

From 1990 to 2007, Mr. Zaccone worked for Tempel Steel as a business support specialist. (Administrative Record ("R.") 00387). As a Tempel employee, he received both short-term and long-term disability insurance coverage through Standard Life Insurance Company ("Standard"). (R. 00382, 00494). On September 1, 2006, Mr. Zaccone stopped working. He had a history of back problems and, as it turned out, he did not return to work until February 13, 2007. Even then, he was only able to work part time. (R. 00378, 00479). By October 5, 2007, he had ceased work completely. (R. 00378, 00479).

Mr. Zaccone received short-term disability benefits at 100% of his salary from September 1, 2006, through October 8, 2007. (R. 00378, 00382). On October 9, 2007, Tempel Steel submitted Zaccone's long-term disability benefits application to Standard. (R. 00376). The application included a statement from Mr. Zaccone and reports from two treating physicians. Mr. Zaccone

described his injury as "chronic back pain and neuropathy, failed back syndrome" caused by "degenerative disc problem" and perhaps a December 1991 car accident. (R. 00385-86).

In his report, Dr. Manganelli listed Mr. Zaccone's primary diagnosis as "failed back syndrome," his secondary diagnosis as "peripheral painfull [sic] neuropathy," and his "other diagnoses" as "failed neck syndrome." (R. 00290). Dr. Manganelli said that Mr. Zaccone suffered symptoms as "intractable back and bilateral leg pain (even after spinal cord stimulator)." (R. 00290). The doctor explained that, due to this intractable pain, he recommended Mr. Zaccone stop working on September 27, 2007. (R. 00291). He added that Mr. Zaccone was limited by "[significant] standing, sitting, walking intolerance" and that he expected this impairment to be "permanent." (R. 00291).

Dr. Maida listed Mr. Zaccone's primary diagnosis as ICD Codes 724.0 (spinal stenosis other than cervical) and 722.93 (other and unspecified disc disorder of lumbar region). (R 00292-293). Dr. Maida added a secondary diagnosis of ICD Code 953.0 (injury to cervical nerve root). (R. 00292). He indicated additional diagnoses of "chronic back pain, neuropathy in legs [and] feet, degenerative disc problem." (R. 00292).

Mr. Zaccone was scheduled for termination as of the end of October 2007. He was off work between September 1, 2006, and February 13, 2007 and then again starting October 5, 2007. (R. 00378). Between February 13, 2007 and October 5, 2007, Mr. Zaccone was performing just part of his job, as he was unable to handle his quality control duties. (R. 00378). When Standard contacted him, Mr. Zaccone explained that he could not do the portions of his job that required him to move among different departments like shipping and quality control did. (R. 00377). Mr. Zaccone told Standard that he had had seven lumbar surgeries and one cervical surgery since 1991.

(R 00377).  He explained that he had a spinal fusion in 2005 and that "that is when the neuropathy in his legs and feet began as well." (R. 00377).  He said that he went off work in September 2006 because the conservative treatment of pain from a failed back surgery in 2005 was not working. (R. 00377).

On October 15, 2007, Standard determined that Mr. Zaccone was precluded from performing the material duties of his own occupation, due to his conditions of failed back and neck syndrome, and peripheral neuropathy. (R. 00289, 00372).  Under the insurance plan, a person was considered disabled from their own occupation:

> if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder:
>
> 1. You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and
> 2. You suffer a loss of at least 20% in your Indexed Predisability Earnings when working in your Own Occupation.
> …
> Own Occupation means any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation you are regularly performing for your Employer when Disability begins. In determining your Own Occupation, we are not limited to looking at the way you perform your job for your Employer, but we may also look at the way the occupation is generally performed in the national economy….

(R. 00500).

Standard's medical case manager noted that Mr. Zaccone had a:

> history of 7 lumbosacral surgeries and one cervical surgery.  The claimant has had a stimulator implanted.  He has attempted to work at a modified capacity but is unable to sustain that.  The claimant is precluded from any work activities on a full time basis with continuity.  The claimant's condition isn't expected to improve. . . . R[eturn] T[o] W[ork] is not expected.

(R. 00289).  The claim decision noted that Mr. Zaccone was:

only answering the phone and doing the computer work since August 2006. The claimant was completely incapable of taking in the materials needed to complete the order, nor able to travel to other departments for quality checks, process express deliveries, or handle special requests from customers that would require collecting the product. Therefore, it is determined that the claimant was not performing the material duties of his own occupation with reasonable continuity.

(R. 00372). It went on to say that it was reasonable that the claimant could not perform the duties of his own occupation and that he "will meet the definition of disability through the Any Occupation date of February 27, 2009," and that the author would "recommend approval of the Any Occupation decision." (R. 00372). Mr. Zaccone was notified of Standard's decision to approve his disability claim by letter dated October 16, 2007. (R. 00049-51). In the October 16, 2007 letter, Standard stated that it had determined that Zaccone became disabled on September 1, 2006, and benefits became payable on February 28, 2007, following the 180-day waiting period. (R. 00049).

**B.**

A week later, however, Standard requested additional records from Dr. Maida and Dr. Manganelli covering the period from January 2007 to October 23, 2007. (R. 00212, 00215). Among the medical records Dr. Maida provided were notes covering Mr. Zaccone's visit to his office on January 2, February 2, February 26, March 14, April 3, April 19, May 24, July 2, and August 23, 2007. (R. 00216-00223, 00226-00247). On January 2, February 2, February 26, March 14, May 24, July 2, and August 23, 2007, Dr. Maida noted that he performed neurological exams that were normal. (R. 00246, 00243, 00240, 00236, 00227, 00222, 00218). On February 2, 2007, Dr. Maida reported that Dr. Manganelli had implanted a neurostimulator in January 2007. (R. 00242). Dr. Maida also noted "no further narcotics." (R. 00244). On February 26, 2007, Dr. Maida reported that a straight leg raising test was negative. (R. 000240). On April 19, 2007, the doctor wrote that Mr.

Zaccone said his back pain was "OK," and that he was doing better with the stimulator. (R. 00229). On July 2, and August 23, 2007, Dr. Maida noted that musculoskeletal exams of Mr. Zaccone's neck, back, upper extremities, lower extremities, and gait were all within normal limits. (R. 00222, 00218).

Dr. Maida's records also included notes covering Mr. Zaccone's treatment with podiatrist Julie Andreas. (R. 00250-00253). On May 5, May 17, and June 18, 2007, Dr. Andreas noted that Zaccone's "Muscle strength is 5/5 supinators and pronators. Joints are congruous, equal, and pain free." (R. 00253, 00252, 00250). On May 5, June 4, and June 18, 2007, Dr. Andreas noted that Zaccone's "Neurovascular status is intact." (R. 00253, 00251, 00250). On May 17, 2007, Dr. Andreas reported: "Neurologic: Grossly intact to sharp/dull, light touch, and proprioception bilaterally." (R. 00252).

Dr. Manganelli provided the operative report of T3, T4, and T5 intercostal nerve blocks, performed by Dr. Yousuf Sayeed on August 31, 2007. (R. 00214). Dr. Sayeed noted that Mr. Zaccone "recovered and [was] sent home in good condition. He will follow up with Dr. Manganelli in the office." (R. 00214). No follow-up records were provided. (R. 00213-00214).

On November 20, 2007, Standard consulted Dr. Mary Lindquist, who is Board Certified in Internal Medicine and Independent Medical Examination, and whose practice focuses on non-surgical management of spinal disorders. (R. 00204-00207). In her December 18, 2007 Physician Consultant Report, Dr. Lindquist noted that the "records submitted for review yield very little information regarding the claimant's neck and back conditions other than some APS forms…from the claimant's treating pain specialist and his [primary care physician]." (R. 00198). Dr. Lindquist further noted that Mr. Zaccone reported "that he underwent 'laser surgery' at L5-S1 two times in

1992 and then underwent an L5-S1 laminectomy that same year. [Mr. Zaccone] also listed that he underwent C6-7 fusion in 1996." (R. 00198). She added that "it appears that he is on a short-acting opioid up to 3 to 4 times per day along with an anti-inflammatory agent plus the spinal cord stimulator…without documentation of cognitive dysfunction in relation to these medications. There has been no documentation of any focal neurological deficits." (R. 00199). "[F]rom the records presented thus far," Dr. Lindquist said she was "unable to determine the exact nature of the claimant's spinal condition. Certainly, no evidence has been presented thus far to suggest an ongoing active cervical or lumbar radiculopathy." (R. 00200).

Standard also consulted Dr. Janette Green, Board Certified in Internal Medicine. (R. 00196-197). In her January 16, 2008 Physician Consultant report, Dr. Green reviewed Dr. Maida's 2007 office notes, records from Mr. Zaccone's podiatrist, Dr. Julie Andreas, and from his gastroenterologist, Dr. Harold Mozwecz. (R. 00190-192). Dr. Green noted that Dr. Maida's January 2007 examination of Mr. Zaccone reflected a normal neurological findings, and that Dr. Maida diagnosed Mr. Zaccone with spinal stenosis. (R. 00190). Dr. Green opined that "[t]he conditions supported by the documentation include those of chronic back pain and atypical chest pain. (R. 00192). But, she added that there was "no documentation that indicates that the claimant has any neurological deficits, such as radiculopathy or myopathy." (R. 00192).

## C.

On January 22, 2008, Standard informed Mr. Zaccone that it was "conducting an investigation to determine if [the Other Limited Conditions] Limitation applies to your claim." (R. 00038). In its letter, Standard wrote, "If you have any information that would indicate or support that the Limitation should not be applied and/or that you are Disabled by a condition that is not

8

limited by this provision, please send this information to us as soon as possible. We want to make sure all information is carefully considered and evaluated before we make our decision." (R. 00038).

As already noted, the limitation at issue provides:

> A. Mental Disorders, Substance Abuse and Other Limited Conditions
> Payment of LTD Benefits is limited to 12 months during your entire lifetime for a Disability caused or contributed to by any one or more of the following, or medical or surgical treatment of one of the following:
> …
> 3. Other Limited Conditions.
> …
> Other Limited Conditions means…chronic pain conditions…arthritis, diseases or disorders of the cervical thoracic, or lumbosacral back and its surrounding soft tissue…. However, Other Limited Conditions does not include…herniated discs with neurological abnormalities that are documented by electromyogram and computerized tomography or magnetic resonance imaging, scoliosis, radiculopathies that are documented by electromyogram, spondylolisthesis, grade II or higher, myelopathies and myelitis, traumatic spinal cord necrosis, osteoporosis, discitis, Paget's disease.

(R. 00509-00510).

By letters dated January 29, 2008, Standard provided Dr. Maida and Dr. Manganelli with the Physician Consultant Reports of Dr. Lindquist and Dr. Green, and asked them to comment on the reports. (R. 00034-00037). Standard explained that it was "having difficulty finding satisfactory support for a diagnosis, other than chronic back pain," and requested Dr. Maida and Dr. Manganelli to provide any diagnostic studies or tests that would provide evidence of Zaccone's condition. (R. 00034, 00036).

Dr. Manganelli responded by letter the same day. (R. 00165-168). He said he "dramatically disagreed with the consulting physicians' assessment regarding the nature and extent of Mr. Zaccone's disability." (R. 00165). He felt their opinions were based on inadequate evidence and were hamstrung by the fact that they had never seen or treated Mr. Zaccone. (R. 00165). Dr.

Manganelli went on to say that Mr. Zaccone had a diagnosis of "failed back syndrome and significant lumbar degenerative disk disease as documented by multiple MRI scans," and ongoing intractable bilateral lower extremity pain and dysesthesia. (R. 00166). He stated that his "patient furthermore had diskogram-proven concordant pain and was subsequently treated with a lumbar fusion by Dr. Ronjon Pain [sic], an orthopedic spinal surgeon. … He did undergo some transforaminal epidural steroid injections [after the fusion] with some moderate improvement in symptoms." (R. 00166). He noted that Mr. Zaccone has had four lumbar spine operations and one cervical spine operation, and has a diagnosis of "failed back syndrome." (R. 00165). He explained that "EMG studies do not always reveal abnormalities in patients who are suffering from chronic progressive and intractable pain because they do not record from certain smaller pain fibers." (R. 00165).

Dr. Manganelli continued, noting that "by November of 2006, the patient was once again having difficulty with prolonged sitting…" and that his pain "was once again exceedingly difficult to manage…." (R. 00166). He said that a spinal cord stimulator implant was performed in mid January of 2007, and that Mr. Zaccone "did get excellent coverage of his bilateral lower extremity pain and dysesthesia from the spinal cord stimulator." (R. 00166). Dr. Manganelli said Mr. Zaccone returned to Dr. Manganelli's clinic in early to mid July of 2007 for upper chest wall pain, and that a CAT scan at that time revealed "some significant cervical degenerative disk disease and associated adjacent level spinal stenosis; however, his thoracic spine at that time did not show any significant neurocompressive disease." (R. 00167). Mr. Zaccone underwent a trial of cervical epidural steroid injections with a "presumptive" diagnosis of radiculitis. (R. 00167). Dr. Manganelli referred him

"on to neurosurgery for reevaluation," and said that a CT myelogram was performed, but he did not know the results. (R. 00167).

Dr. Manganelli reported that Mr. Zaccone was "[c]urrently. . . struggling with ongoing low back and bilateral lower extremity pain and dysesthesia. This pain is considered a neuropathic type pain." (R. 00167). The doctor said that "Mr. Zaccone should probably carry the diagnoses of failed back surgery syndrome with chronic intractable pain, bilateral lower extremity neuropathic pain, cervical degenerative disk disease, status-post cervical fusion, cervical adjacent level disease with acquired spinal stenosis, thoracic radiculitis, trochanteric bursitis, chronic reactive depression, and chronic anxiety." (R. 00168). He reiterated that Mr. Zaccone "does continue to suffer from pain which limits him dramatically in regard to his prolonged sitting and standing ability, and the associated required medications and reactive depression I believe have hampered his ability to concentrate and focus his mind as well." (R. 00168). Dr. Manganelli closed by saying that he "would be pleased to forward the patient's entire medical record to [Dr. Lindquist and Dr. Green] for review after which a much more informed opinion can certainly be made." (R. 00165). Dr. Manganelli did not provide any medical records with his January 29, 2008 response letter, or diagnostic studies or tests. (R. 00165-00168).

Dr. Maida provided his response by letter on February 12, 2008. In it, he noted that Mr. "Zaccone had a neurostimulator implanted in January 2007 which helped about 50% initially, but now is decreasing his pain by an average of about 30%." (R. 00157). Dr. Maida stated "Post myelogram CT on January 11, 2008 showed results of an extensive laminectomy at L5-S1 also with evidence of an anterior and posterior fusion with screws in place at the level L5 and S1. He also had disk bulging at L4-L5, L3 and L4 as well as L2-L3. A stimulating device was noted to be in place."

(R. 00157). The doctor explained that "[t]he issue here for his disability is the spinal deterioration related to primary back disease and multiple surgeries. There is some weakness demonstrated in his legs but the issue is the severity of his pain which I would have no reason to doubt." (R. 00158). Dr. Maida concluded: "In summary, Mr. Zaccone has had multiple back surgeries and long standing pain which is severe. He is unable to do any meaningful activities sitting, standing or walking without suffering severe back pain burning into the buttocks (9-10/10). As a result, he must be considered totally disabled." (R. 00158). Along with his letter, Dr. Maida included an operative report from Mr. Zaccone's December 16, 1992 lumbar laminectomy, discectomy, and foraminotomy to treat a herniated disk at the L5-S1 level. (R. 00159-00160). Dr. Maida did not provide any diagnostic studies or tests with his February 12, 2008 response letter. (R. 00157-00160).

Dr. Lindquist reviewed the submissions from Drs. Manganelli and Maida, and she reported back to Standard on March 3, 2008:

> Both [Dr. Maida and Dr. Manganelli] have diagnosed the claimant with severe chronic pain secondary to failed back syndrome status post four lumbar surgeries culminating in an anterior/posterior L5-S1 instrumented fusion in 2005 [sic] with reactive depression and anxiety requiring ongoing medication support, including opioids (short-acting), neuropathic pain inhibitors, and antidepressants, along with a dorsal column stimulator, with only partial relief from these interventions. Both providers have described ongoing bilateral lower extremity pain and dysesthesias, but not in a distinct radicular pattern. Likewise, consistent ongoing focal neurological deficits have not been described per either provider, although on one occasion Dr. Maida (in his letter dated February 12, 2008) did describe rather diffuse bilateral extremity weakness, again not in any distinct myotomal pattern.

(R. 00145). Dr. Lindquist then went on to opine that:

> It is referenced that cervical imaging has been notable for multilevel degenerative arthritis with postsurgical changes. It has not been described that the claimant has ongoing upper extremity symptoms with associated focal neurological deficits on exam. The claimant does have ongoing bilateral lower extremity pain and dysesthesias not characterized recently in a discrete radicular pattern by either history [or] physical exam findings. No electrodiagnostic data of either the upper or

lower extremities has been submitted. It is referenced in Dr. Maida's letter that the claimant underwent CT myelogram on January 11, 2008, that was notable for postsurgical changes without evidence for complication of the L5-S1 fusion construct. Multilevel disc bulges were described without neurocompressive features at any segment. Hence, the claimant's documented condition consists of cervical and lumbar degenerative arthritis without definitive evidence of associated ongoing active radiculopathy. The policy language may be applied accordingly.

(R. 00146).

In a letter dated March 19, 2008, Standard notified Mr. Zaccone of its decision that the Other Limited Conditions provision applied to his disability claim. (R. 00024). The letter informed him that:

The information in your claim file continues to confirm that you have been Disabled by chronic back and neck pain, cervical and lumbar degenerative arthritis, and disc bulges without neurocompressive features. Because chronic back and neck pain, cervical and lumbar degenerative arthritis, and disc bulges without neurocompressive features are Other Limited Conditions as defined by the terms of the Tempel Steel Company Group Policy, The Standard has applied the Other Limited Conditions Limitation to your claim. Benefits first became payable to you for Other Limited Conditions on February 28, 2007. Therefore, the 12 month Maximum Benefit Period for Other Limited Conditions will end on February 27, 2008.

(R. 00024). Standard closed Mr. Zaccone's claim with payment through March 27, 2008 (AR 00319), and Mr. Zaccone's coverage under the Group Policy terminated as of February 27, 2008. (R. 00499).

## D.

Mr. Zaccone had a right to appeal the determination, which he did on September 3, 2008. (R. 00394). In a letter to Standard, his attorney stated their case:

The disability policy covering Mr. Zaccone provides benefits for 'herniated discs with neurological abnormalities that are documented by electromyogram and computerized tomography or magnetic resonance imaging, …radiculopathies that are documented by electromyogram,….' Notably no particular time reference is placed on this requirement."

(R. 00395). Mr. Zaccone's counsel claimed that his client's "current condition meets the conforms [sic] to the policy terms requiring documented neurological abnormalities qualifying him for reinstatement of long term disability benefits." (R. 00395). Mr. Zaccone's counsel added that Mr. Zaccone's condition is "chronologically and medically related to the symptoms first documented and proved back in 1992." (R. 00395). He also noted "Mr. Zaccone eventually endured an anterior/posterior instrumented fusion at L5-S1 in 2005 [sic]." (R. 00395).

Mr. Zaccone submitted a good deal of additional evidence with his appeal. His attorney retained an orthopedic surgeon, Dr. Bruce Montella, to review his medical records and provide an opinion. Dr. Montella wrote that Mr. Zaccone was disabled as a result of herniated lumbar discs and radiculopathy. He said there was "there is evidence of neurocompressive features on his studies," but agreed that "there [was] no gross evidence . . . ." He explained that the studies were "static" and that Mr. Zaccone's discs were "*likely* causing dynamic compression that is not fully revealed on his current radiographs." (R. 00396)(Emphasis supplied). However, he submitted no studies to support his assessment.

Mr. Zaccone did submit a number of diagnostic studies along with his appeal. In January 1992, an MRI revealed "[d]egeneration of the disc at the level of L5-S1 associated with posterior bulge or mild degree of ventricle herniation at the level of L5-S1. (R. 00398). A June 1992 MRI showed "small protrusion of disc at the L5-S1 in the right paramedian position, representing an annular tear with very minimal herniation." The finding was "consistent with an annular tear with very minimal protrusion." The "very small disc [was] in contact with the S1 nerve root, [but] the nerve root [was] not displaced and [was] not thickened." (R. 00401). Finally, the November 1992 study demonstrated "[s]mall median and right paramedian herniated disc at L5-S1 in direct contact

with both S1 nerve roots and slightly more so to the right, unchanged in size or appearance since the previous study of 6/11/92." (R. 404).

Not long after that, on December 16, 1992, Mr. Zaccone had a lumbar laminectomy, discectomy, and foraminotomy, Following the procedure, the surgeon, Dr. Stamelos, found Mr. Zaccone to be in "satisfactory neurological condition." (R. 00405). Mr. Zaccone was discharged on the 19th, at which time Dr. Stamelos noted that "[h]e had done surgically without any kind of episode of problem with an excellent prognosis…. Postoperatively, he had immediate improvement, was able to ambulate and rehabilitate himself quickly, which brought about his early discharge…. The patient tolerated the procedure quiet well, having improvement of his right sciatica and his inability to sit and drive…. The prognosis is good." (R. 00407).

The studies after that showed improvement over the 1992 studies. On August 13, 1993, there was:

> no demonstration of focal disc protrusion revealed at L1-L2 through L4-L5. The central spinal canal and neural foramen at these levels are of normal patency. On the prior exam, L5-S1 posterior disc protrusion was noted to be posterocentral/right paramedian. On the present study, there is generalized posterior disc bulging. A minimal amount of enhancing epidural scar is noted inferior to the L5-S1 intervertebral disc in the midline. There is no compromise of the dural sac at this level. The inferior aspects of the L5-S1 neural foramina bilaterally are mildly narrowed by lateral disc bulging. A focal area of signal void is seen ventral to the right S1 nerve root on T-1 weighted axial image 2 of 14. This does not displace or distort the right S1 nerve root and this is felt to represent magnetic susceptibility artifact from a retained metal fragment.

(R. 00408). Significantly, the radiologist concluded: "There is no demonstration of a recurrent L5-S1 herniated nucleus pulposus." (R. 00408).

The next MRI was from March 3, 1996, and demonstrated degenerative changes:

> degenerative changes of the cervical spine with dehydration of the disc throughout. There is marked flattening of the height of the disc at the level of C5-C6 and C6-C7.

There is some hypertrophic degenerative change at the level of C5-C6 and C6-C7 which is effacing anterior part of the dural sac more so at the level of C5-C6 on the right. Spinal canal per se is otherwise unremarkable. Spinal cord is not remarkable.

(R. 00409).

On August 11, 2004, an MRI showed that:

alignment is normal. Vertebral body heights and marrow signal are maintained. Endplate degenerative marrow signal changes are noted at L5-S1. There are small vertebral hemangiomata within the L2 and L3 vertebral bodies. The conus terminates at the expected level and is normal in appearance, as is the intrinsic signal of the distal spinal cord. There is severe degenerative disc disease at L5-S1 where there is marked loss in disc height. There is early desiccation of the L2-L3, L3-L4, and L4-L5 discs without significant loss in disc height. Bilateral hemilaminectomy changes are noted at L4-L5.

(Doc. 12-3, AR 00413). The radiologist also noted:

At L1-L2 no abnormalities. At L2-L3 there is minimal disc bulge resulting in minimal right neural foraminal stenosis. No focal disc protrusion or central canal stenosis. At L3-L4 there is mild disc bulge resulting in mild right neural foraminal stenosis. No focal disc protrusion or central canal stenosis. At L4-L5 bilateral hemilaminectomy changes are noted. There is mild diffuse disc bulge resulting in minimal right neural foraminal stenosis. No evidence of recurrent disc protrusion or central canal stenosis. At L5-S1 there is minimal disc bulge and mild bilateral facet arthropathy resulting in minimal bilateral neural foraminal stenosis. No focal disc protrusion or central canal stenosis.

(R. 00412-00413). The radiologist's impression was: "1. Laminectomy changes at L4. 2. Degenerative disc disease, most severe at L5-S1 with multilevel disc bulge resulting in mild neural foraminal stenosis as detailed above. No focal disc protrusion or central canal stenosis." (R. 00412). With his appeal, Zaccone submitted a report of an MRI of the cervical spine performed on April 20, 2005. (Doc. 12-3, AR 00424-425). The radiologist noted "AP alignment of the cervical spine is grossly anatomic. Mild multilevel end plate degenerative changes are seen. The craniovertebral junction is unremarkable. Vertebral body heights are preserved without compression deformity.

Partial osseous fusion of C6 and C7 is noted. The visualized paraspinal soft tissues are grossly unremarkable. No abnormal intraspinal enhancement is seen following gadolinium administration."

(Doc. 12-3, AR 00424). The radiologist also noted:

> At C2-C3, no disc bulge or protrusion is identified. At C3-C4, minimal posterior end plate ridging and left uncinate process hypertrophy are noted. At C4-C5, no disc bulge or protrusion is identified. At C5-C6, posterior disc osteophyte complex is present, which abuts the right ventrolateral cord without intrinsic signal abnormality to suggest edema or myomalacia. Findings result in mild central canal compromise, moderate to severe right neural foraminal stenosis and mild left neural foraminal stenosis. At C6-C7 and C7-T1, no disc bulge or protrusion is identified.

(R. 00424-425).

> An April 2005 MRI of Mr. Zaccone's thoracic spine was interpreted to reveal:

> There is normal thoracic kyphosis. Vertebral body heights are preserved, without compression deformed. Mild multilevel end plate degenerative changes are seen. Marrow signal is within normal limits for age, with the exception of a few scattered vertebral hemangiomata, the largest involving the right T7 vertebral body posteriorly with extension into the adjacent pedicle. The thoracic spinal cord is normal in caliber and signal intensity. No abnormal intraspinal enhancement is seen following gadolinium administration. The visualized paraspinal soft tissues are grossly unremarkable.

(R. 00425). The radiologist's impression was of "1. A few tiny and small disc protrusions…with minimal to mild encroachment on the ventral thecal sac. 2. No discrete cord abnormality." (R. 00426).

> At the same time, an MRI of the lumbar spine demonstrated:

> straightening of the normal lumbar lordosis. No spondylolysis or spondylolisthesis is identified. Reactive end plate changes are seen at L5-S1. There has been posterior fixation in the interim, spanning L5 and S1. The distal spinal cord and conus are normal in morphology, signal intensity and position. No abnormal intraspinal enhancement is seen following gadolinium administration. Disc desiccation is present at L2-L3 through L5-S1. … At L1-L2, no disc bulge or protrusion is identified. At L2-L3, there is minimal diffuse disc bulge resulting in minimal inferior right neural foraminal stenosis. By report, stable level. At L3-L4, minimal diffuse bulge is present resulting in very mild inferior right neural foraminal stenosis. By

report, stable level. At L4-L5, there is minimal diffuse bulge resulting in very mild bilateral inferior neural foraminal stenoses. By report, essentially stable level. At L5-S1, no disc bulge or protrusion is identified. Postoperative changes are seen, without obvious encroachment on the thecal sac or neural foramen.

(R. 00426-427). The radiologist's impression was "1. Minimal diffuse disc bulges at L2-L3 through L4-L5, resulting in minimal and very mild neural foraminal stenoses as detailed above. … 2. Incidentally noted subcentimeter T2-hyperintense focus in the inferior pole of the left kidney. While this most likely represents a simple cyst, correlation with ultrasound is recommended for confirmation." (R. 00427).

The next MRI was performed in September 2005. (R. 00429-00430). Again, there was evidence of disc dessication and mild disc bulging, but no mention of herniation. The radiologist characterized the study as revealing: "1. Postoperative changes are seen without evidence of recurrent disc or central canal or significant neural forminal stenosis. The overall appearance is unchanged since the previous. 2. On the current examination there is mild increased signal on the fat saturated post-contrast studies in the L5-S1 vertebral bodies which may be reactive in nature and due to some underlying edema but this may be accentuated also by artifact." (R. 00430).

A CT scan of the lumbar spine performed on December 1, 2005, demonstrated:

no evidence of disc herniation [at L3-L4]. No significant degenerative changes are present. The nerve rootlets are felt to exit normally. L4-L5: Two screws through the lateral posterior elements of the top of L5 are present. The disc space is unremarkable. There is mild left bulging of the disc with no evidence of herniation. There is no significant degenerative change involving the facet joints. The nerve rootlets exit normally. L5-S1: Two posterior screws through the S1 segment as well as one anterior screw are present. There is felt to be fusion at the L5-S1 disc level. No gross disc herniation is identified.

(R. 00432). Next comes yet another MRI of Mr. Zaccone's lumbar spine, performed in September 2006. (R. 00435-436). Yet again there was no evidence of disc herniation. The radiologist

summarized the results as demonstrating "[p]ostoperative changes . . . without evidence of central canal or neural foraminal stenosis. Diffuse mild degenerative disc changes are seen throughout the remainder of the lumbar spine with relative sparing of L1-L2. The overall appearance is unchanged." (Doc. 12-3, AR 00436).

At the same time, an MRI of Mr. Zaccone's thoracic spine was characterized as a "redemonstration of a few mild disc protrusions scattered throughout the thoracic spine, mildly indenting the thecal sac, but resulting in no significant cord compression, central canal stenosis, or neural foraminal stenosis. The findings are essentially stable since the previous study with exception of a tiny new disc protrusion at T5-T6." (R. 00438).

Mr. Zaccone underwent a myelogram of his lumbar, cervical, and thoracic spine on January 11, 2008. The doctor interpreted the study as showing "post surgical change at the level of L5-S1. [along with] small bulging disc at the level of L2-L3, L3-L4 and L4-L5 [and] spondylosis over the cervical region, more prominent at the level of C5-C6. (R. 00442-443; R. 00141-142).

A CT scan of Mr. Zaccone's cervical, dorsal and lumbar spine was performed the same day. The doctor summarized the CT scan of the dorsal spine as "unremarkable." It showed "degenerative change of the dorsal spine . . . . [but n]o significant bulging or herniated disc is identified. No significant stenosis is seen." (R. 00440-441; R. 00139-140). The CT scan of the cervical spine was unremarkable as well, showing "degenerative change . . . [but n]o significant bulging or herniated disc [and n]o significant stenosis . . . ." (R. 00440-441; R. 00139-140). Finally, the lumbar spine CT revealed:

> no significant bulging or herniated disc identified [at T12-L1]. The left cheek stimulating device is seen in the posterior epidural space. The conus medullaris is unremarkable. No significant bulging or herniated disc is seen. L1-L2: There is no significant bulging or herniated disc identified. No stenosis is seen. L2-L3: There is

slight bulging of the nucleus pulposus and slight prominent of the ligament of flavum. No significant bulging or herniated disc is seen and no significant stenosis is identified. L3-L4: There is a slight diffuse bulging of the nucleus pulposus with slight compression of thecal sac. No significant stenosis is seen. L4-L5: There is diffuse bulging disc with slight compression to the thecal sac. L5-S1: There is extensive laminectomy. There appears to be anterior and posterior fusion with intrapedical screws in place at the level of L5 and S1. The position of the screws appears to be satisfactorily. The screws are intact. No significant subluxation is seen.

(R. 00441; R. 00140).

In addition to these studies, Mr. Zaccone also submitted office notes from one of his treating physicians, Dr. Paul. In November 2004, Dr. Paul noted that Mr. Zaccone "has undergone a discogram which shows L5-S1 concordant pain. He has significant disc space collapse and modic endplate changes past that level and the levels are relatively well spared. … He has had prior surgery at that level including two laser surgeries followed by a laminectomy and discectomy at L5-S1. The laminectomy and discectomy was quite successful for him in relieving his leg pain. On physical exam, he is neurologically intact today. He has no Waddell signs." (R. 00415). The doctor went on to say that "Mr. Zaccone wants to proceed with surgery. I have discussed options with him at length including possibility of future disc replacement as opposed to lumbar fusion. He does not wish to wait. He…does wish to go forth with fusion at the present time…." (R. 00415).

In the December 2004, Dr. Paul noted that Mr. Zaccone was "two weeks status post L5-S1 anterior and posterior spinal fusion. . . . He is complaining of no true weakness or bowel or bladder complaints of the bilateral lower extremeties. … On physical exam, he is neurologically intact in the L2 to S1 nerve root distribution in bilateral lower extremities. He does have tension in his back in the hamstrings upon bowstring sign, bilateral lower extremities. His reflexes are symmetric." (R. 00419). X-rays looked "quite good." (R. 00419). Dr. Paul "believe[d] in the long run [Mr. Zaccone's] reconstruction will bode quite well for him." (R. 00419).

On April 12, 2005, Dr. Paul reported that Mr. Zaccone was "approximately 6 months status post single level decompression and minimally invasive anterior and posterior spinal fusion [and] all his back and preoperative leg pain are gone. He is doing much better in that regard. His complaints are more diffuse and harder to pinpoint. He describes some vague numbness and tingling in his feet with pain when he walks for periods of time at his metatarsal heads with diffuse numbness and tingling. He describes a mild ache in the legs as well. X-rays show a solidly healed fusion at L5-S1. . . . an EMG . . . indicates no polyneuropathy. (R. 00423). Dr. Paul's impression was of "Healed L5-S1 fusion." (R. 00423). He also noted that:

> In terms of his actual preoperative lumbar complaints, they are simply all gone. He has been on some Neurontin and has seen the pain specialist for his vague lower extremity complaints. At this point, I do not believe his complaints are lumbar spine related. I will further investigate the spinal cord and look at the cervical and thoracic spine to evaluate a cord related issue. He agrees that this may be the case. He does not have real radiculopathies and he has healed his fusion and his complaints simply do not coincide with lumbar spine complaints.

(R. 00423).

### E.

Standard consulted with Dr. William Platt, a Board certified neurologist. (R. 00092-94). Dr. Platt evaluated and analyzed all of the medical information in the claim file, and provided a lengthy summary. (R. 00070-80). He began by saying that "Standard has accepted that [Mr. Zaccone's] back condition would prevent him from performing his own occupation. However, the claim has been closed on the basis of disabilities subject to limited pay periods/other limited conditions in the contract. [Mr. Zaccone] has requested review of this decision and contends that his conditions fall within the exceptions for herniated discs with neurologic abnormality documented by EMG, CT, or MRI and radiculopathy documented by EMG." (R. 00070). Dr. Platt went on to

note that, while at least one MRI revealed a herniated disc in 1992, this was before lumbar laminectomy surgery in December of that year. Thereafter, Mr. Zaccone's condition improved. Studies showed degenerative disc disease and spondylosis, which necessitated a fusion at C6-C7, but not disc herniation. While more recent imaging "has demonstrated some mild cord compromise on the right at C6-7 as well as neuroforaminal stenosis, . . . there is no clear indication of upper extremity radicular symptoms or findings or evidence of myelopathy. (R. 00075, 00078). Indeed, "throughout the records there is no documentation of any actual neurologic deficits indicating myelopathy or radiculopathy." (R. 00079).

Dr. Platt then acknowledged that Mr. Zaccone "has had recurrent symptoms since and is thought to have lower extremity radiculopathy or polyneuropathy. . . . He has undergone numerous subsequent imaging studies including the thoracic and lumbar areas with no clear demonstration of thoracic or lumbar spinal stenosis or foraminal compromise that would cause radicular compression. Reportedly, he had an EMG study which did not demonstrate any evidence of radiculopathy. . . . [While there have been] intervals [where] medications have included narcotics, . . . there is no indication of prolonged or ongoing therapy with high-potency or high-dose narcotics. (R. 00078-79).

Implantation of a spinal cord stimulator in January of 2007, . . . has been apparently successful with continued reduction of pain by at least 30%. (R. 00079).

Dr. Platt then stated that "medical information in the file does not clearly support a conclusion that some or all of the claimant's symptoms are the result of herniated discs with neurologic abnormalities. At no time is there clear documentation of specific neurologic abnormalities indicating radiculopathy or myelopathy." [While] Dr. Maida reported bilateral lower

extremity weakness in February 2008, it was not supported in any of his clinical notes. "Otherwise, no neurologic abnormalities are reported by any of his treating physicians." (R. 00079).

Dr. Platt explained that Mr. Zaccone had a herniated disc at L5-S1, but it was "removed surgically in 1992, and fusion was performed at L5-S1 in November of 2004 with subsequent resolution of low back and lower extremity symptoms at least for a time. Subsequently, there has been no definite demonstration of lumbar herniated discs with neurologic abnormalities. It is noted that imaging of the cervical spine does show some spinal stenosis and foraminal stenosis, especially at C5-6, but clinically there has been no indication of upper extremity symptoms, findings, or evidence of myelopathy. … There is indication at one point that EMG was normal. CT and MRI scans have [not] . . . show[n] clear neurologic compromise." (R. 00079).

Dr. Platt concluded by stating that "[t]he medical information in the file does not support a conclusion that the claimant's leg pain and dysesthesias are the result of radiculopathy. As stated, no clear neurologic abnormalities have been documented clinically, and imaging studies subsequent to the original lumbar laminectomy and more recently L5-S1 fusion have not demonstrated any clear nerve root compromise. The only mention of EMG is in Dr. Paul's note of April 12, 2005 indicating that he had seen Dr. Summers, and EMG showed no evidence of polyneuropathy. Thus, there is no clear indication in the record that radiculopathy was documented by EMG." (R. 00080).

### F.

On October 13, 2008, Standard wrote to notify Mr. Zaccone that it was upholding its decision to close his claim with payment through March 27, 2008. (R. 00309-314). Standard pointed out that the "Group Policy limits payment of benefits to 12 months during Mr. Zaccone's entire lifetime for a Disability caused or contributed to by any one or more of the conditions described

under the Disabilities Subject to Limited Pay Periods provision, including Other Limited Conditions. The Group Policy specifically states that Other Limited Conditions include arthritis and diseases or disorders of the cervical, thoracic or lumbosacral back and its surrounding soft tissues. Both Mr. Zaccone's cervical and lumbar spine conditions are clearly diseases or disorders of the cervical and lumbosacral back and its surrounding soft tissue.

However, the letter went on, the Group Policy excludes certain conditions that are documented by electrodiagnostic and radiographic studies from the definition of Other Limited Conditions. "Specifically, the policy provision states that Other Limited Conditions does not include either of the following: 1) herniated discs with neurological abnormalities that are documented by electromyogram and computerized tomography or magnetic resonance imaging, or 2) radiculopathies that are documented by electromyogram." (R. 00309-310). Because there was an "absence of evidence supporting Disability due to a current radiculopathy or herniated disc with neurological abnormalities documented by radiographic and electrodiagnostic studies, no LTD Benefits are payable to Mr. Zaccone beyond the end of the 12-month limited pay period for Other Limited Conditions." (R. 00311).

Standard concluded that it did "not find sufficient basis for changing the decision to close Mr. Zaccone's claim." It acknowledged that "Mr. Zaccone has undergone multiple surgeries involving his cervical and lumbar spine" and explained that it was "not denying that Mr. Zaccone continues to experience pain and impairment due to his arthritis and degenerative disc disease." Standard also acknowledged that "Mr. Zaccone continues to be unable to perform his Own Occupation," which is "why . . . Standard paid LTD benefits through March 27, 2008." But, "in order to be eligible for additional benefits, the medical evidence must support that Mr. Zaccone is

unable to perform his Own Occupation as a result of a condition or conditions not subject to the Disabilities Subject to Limited Pay Periods provision. We find that it does not. Therefore, we find that the decision to close Mr. Zaccone's claim is correct and must be upheld." (R. 00313).

## II.

## ANALYSIS

Under the terms of the Group Policy, an individual suffering from a condition listed among "Other Limited Conditions" can only receive payment of benefits for twelve months of their entire lifetime. (R. 00509). A person suffering from "chronic pain conditions . . . arthritis, diseases or disorders of the cervical thoracic, or lumbosacral back and its surrounding soft tissue" falls into this twelve month limitation unless one of the exceptions applies. (R. 00509). The two exceptions that Mr. Zaccone argues apply here are: (1) herniated discs with neurological abnormalities that are documented by myelogram and computerized tomography or magnetic resonance imaging; and/or (2) radiculopathies that are documented by electromyelogram. (R. 00510).[1]

---

[1] It is critical to note that a bulging disc is not the same as a herniated disc. Bulging discs are more common, while herniated discs are more likely to cause pain. According to the Mayo Clinic's website:

A bulging disk extends outside the space it should normally occupy. The bulge typically affects a large portion of the disk, so it may look a little like a hamburger that's too big for its bun. The part of the disk that's bulging is typically the tough outer layer of cartilage. Usually bulging is considered part of the normal aging process of the disk and is common to see on MRIs of people in almost every age group.

A herniated disk, on the other hand, results when a crack in the tough outer layer of cartilage allows some of the softer inner cartilage to protrude out of the disk. The protrusion of inner cartilage in a herniated disk usually happens in one distinct area of the disk and not along a large component of the disk, which is more typical of a bulging disk. Herniated disks are also called ruptured disks or slipped disks.

http://www.mayoclinic.org/diseases-conditions/herniated-disk/expert-answers/bulging-disk/faq-20058428.

Since his surgery in December of 1992, there are no required studies under the explicit terms of the Policy, documenting a "herniated" disc with neurological abnormalities or radiculopathies as specified by the Policy. Mr. Zaccone tacitly concedes he has little to go on. The only studies he points to are three magnetic resonance imaging ("MRI") studies: from January 1992, June 1992, and November 1992. (Dkt, # 103, at 4). There was evidence of herniation and neurological abnormalities in these studies, as the January MRI revealed "posterior and central bulge or minimal herniation at the level of L5-S1 with some pressure effect upon the dural sac anteriorly" (R. 00398), and the November one showed a "[s]mall median and right paramedian herniated disc at L5-S1 with both nerve roots. (R. 00404). There was some contact with the nerve root shown in the June study as well, but it was said that the "nerve root was not displaced and not thickened." (R. 00401).

Of course, the problem with these studies is that they were performed prior to Mr. Zaccone's laminectomy-discectomy-foraminotomy in December 1992. After that, there was never again a mention of a herniated disc with – or even without – neurological abnormalities in Mr. Zaccone's studies, except in the negative – *i.e.*, studies were said to show *no* evidence of herniation. (R. 00139-142; 00408; 00409; 00403; 00412-00413; 00424-00425; 00426-00427; 00429-00430; 00432; 00435-00436; 00438; 00442-443; 00440-00441). Moreover, the only EMG mentioned in the record, performed in April 2005, did not establish radiculopathy but, instead, showed "no polyneuropathy." (R. 00423).

And so, Mr. Zaccone has to point to the 1992 studies, even though the herniated disc they revealed was removed in the wake of those studies. (R. 00405-00406). His argument is that the exclusion to the Other Limited Conditions provision provides no time frame for when the required studies have to have been performed, so the 1992 studies are still pertinent. (Dkt. # 89, at 5-6; Dkt.

26

#103, at 5). Given the fact that the herniated disc he was suffering from in 1992 – fourteen years before he applied for disability benefits – was taken care of through a laminectomy-discectomy-foraminotomy in December of 1992. (R. 00405-00406). Thereafter, as already noted, Mr. Zaccone can point to no studies revealing a herniated disc and or radiculopathy.

Moreover, neither Mr. Zaccone, nor any of his physicians provided the 1992 studies until Standard denied Mr. Zaccone's claim and Mr. Zaccone appealed. (*See generally* Dkt. #102). True, that might have been due to the fact that Mr. Zaccone and his doctors were unaware of the exclusion to the Other Limited Conditions provision or didn't understand it. But if his physicians thought that his disability was due to his 1992 herniated disc, it seems that they would have provided such evidence initially. The point is not dispositive, of course, but it is one more thing to consider.

None of this is to say that Mr. Zaccone is not disabled in the ordinary understanding of the term. He clearly has degenerative disc disease and some bulging discs. He points out that the doctor his attorney engaged to review his records, Dr. Montella, opines that he is disabled as a result of herniated lumbar discs and radiculopathy. (Dkt. # 89, at 6-7). The problem for Mr. Zaccone is that such opinion evidence does not satisfy the requirements of the exclusion to the Other Limited Conditions provision.

The exclusion mandates that objective evidence establish a herniated disc with neuropathy and/or radiculopathy. As already noted, in considering Mr. Zaccone's claim, a court is bound by the language of the Group Plan. *Sperandeo*, 460 F.3d at 872. In both *de novo* and arbitrary and capricious reviews of ERISA disability claims, court after court, including the Seventh Circuit, has adhered to a policy's requirement of objective evidence to support a claim. *See, e.g., Ruiz v. Continental Cas. Co.*, 400 F.3d 986, 992 (7th Cir. 2005)(plan administrator's denial of claim was not

unreasonable where claimant's complaints of pain were not supported by objective evidence); *Weitzenkamp v. Unum Life Ins. Co. of America*, 661 F.3d 323, 330 (7th Cir. 2011)(court interpreted plan's "self-reported symptoms" exclusion as requiring objective evidence and followed it in finding plan administrator's denial was arbitrary and capricious); *Judge v. Metropolitan Life Ins. Co.*, 710 F.3d 651, 660 (6th Cir. 2013)("Requiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable."); *Hamma v. Intel Corp.*, 377 Fed.Appx. 674, 676, *1 (9th Cir. 2010)("Because the Plan required the submission of objective medical evidence to support a pain-based disability claim, the lack of such evidence was a reasonable basis for denial."); . *Doyle v. Liberty Life Assurance Co. of Boston,* 542 F.3d 1352, 1358 (11th Cir.2008)("Thus, the Magistrate Judge did not acted improper by requiring objective medical findings where such evidence is required under the terms of the policy."); *Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75, 88 (2nd Cir. 2009)("In light of this notification, MetLife acted within its discretion in requiring some objective evidence that Hobson was disabled.").

Indeed, one court has even gone so far as to say that  "[w]hen a plan requires claimants to provide objective medical evidence, an administrator's decision to deny benefits for failure to produce such evidence is reasonable, even though such evidence might be impossible to obtain for that condition."  *Creel v. Wachovia Corp*., 2009 WL 179584, 7 (11th Cir. 2009)(citing *Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352, 1358 (11th Cir. 2008)).  And, it should not go unnoticed that some of the plans in cases upholding an objective evidence requirement did not even specify such a requirement in their terms – mandating objective evidence was found to be in the plan administrator's discretion.  Here, the terms of the Group Plan not only clearly indicated that

objective evidence was necessary, but specified the types of tests that were acceptable. Unfortunately, Mr. Zaccone did not provide those tests.

As for the opinion of Dr. Montella – which is not the type of evidence the Group Plan requires – he acknowledges the fact that there is no gross evidence of neuropathy or radiculopathy in any of Mr. Zaccone's studies, but at the same time concludes that there *is* evidence of neurocompressive features and multilevel disc herniations. He does not indicate which studies demonstrate this or support his conclusion. As already discussed, review of the post-laminectomy studies does not reveal any such evidence, nor does Mr. Zaccone point to any.

Running counter to Dr. Montella's opinion are a number of reports from physicians who, unlike Dr. Montella, treated Mr. Zaccone. Mr. Zaccone's surgeon, Dr. Stamelos, deemed him in satisfactory neurological condition after his laminectomy-discectomy-foraminotomy. (R. 00405). There is a record of seven office visits in 2007 in which Dr. Maida reported normal neurological findings (R. 00218, 00222, 00227, 00236, 00240, 00243, 246). Dr. Maganella reported in his letter to Standard that Mr. Zaccone suffered from degenerative disc disease causing lower extremity pain. Unlike Dr. Montella, he did not claim that Mr. Zaccone's studies established the required diagnoses, and he could not provide any of the required tests. Instead, he explained that EMGs do not address abnormalities that might be caused by "certain smaller pain fibers." (R. 00166). Dr. Paul reported Mr. Zaccone was "neurologically intact" in November 2004 (R. 00415), and December 2004. (R. 00419). In April 2005, he reported that all of Mr. Zaccone's leg pain was gone and there was no evidence of polyneuropathy. (R. 00423). It is acknowledged that none of Mr. Zaccone's treating doctors ever said he was not disabled – indeed, Drs. Mangella and Maida said the opposite. But,

unlike Dr. Montella, they were unable to say that there was any evidence in the required types of studies that either establish a herniated disc causing neuropathy or establish radiculopathy.

The reports of all Mr. Zaccone's treating physicians, then, to varying degrees, go against Dr. Montella's opinion on this dispositive point. Also countering Dr. Montella's opinion are the reports of the physicians Standard engaged to review Mr. Zaccone's records. Like Dr. Montella, they never examined Mr. Zaccone. The Seventh Circuit has discussed the various biases for and against the opinions of treating physicians and reviewing physicians, most often in Social Security cases. But, the court applied its thinking to the same issue in an ERISA case in *Hawkins v. First Union Corporation Long-Term Disability Plan,* 326 F.3d 914 (7th Cir. 2003)

> A number of social security disability cases apply a "treating-physician presumption," ... though there are grounds for skepticism; physicians naturally tend to support their patients' disability claims, and so we have warned against "the biases that a treating physician may bring to the disability evaluation," explaining that "the patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." But such skepticism may have a stronger basis when the treating physician squares off against a neutral consultant appointed by the Social Security Administration than when the consultant is hired by the administrator of a private plan and so may have a financial incentive to be hard-nosed in his claims evaluation in order to protect the financial integrity of the plan and of the employer that funds it. If the incentives of the treating physician and of the plan's consultant are assumed to be equal and opposite, consideration of incentives drops out and the superior information likely to be possessed by the treating physician, especially when as in this case the consultant does not bother to examine the patient, may support the treating-physician presumption after all.

> The courts are divided on whether the presumption applies to benefits determinations by administrators of ERISA plans. .... We have not addressed the issue. ...What is curious about the cases that we've cited is that all of them treat the issue as one for the reviewing court to resolve. But the procedures followed by plan administrators are matters of contract. Nothing compels an ERISA plan either to adopt or to reject a treating-physician presumption. We know that a plan may specify the degree of deference due the plan administrator's benefit determinations, and hence the scope of judicial review. ... Why can't it equally specify the procedures and rules of evidence, including presumptions, that the plan's administrator shall use to evaluate

claims? Hawkins does not argue that, fairly read, the plan in this case incorporates the presumption.

326 F.3d at 917.

Here, Dr. Montella is not a treating physician. He is arguably as much a partisan as are Standard's reviewing physicians. And he does not have any more "superior information" than Standard's consultants do. Moreover, the question here turns on the existence and interpretation of diagnostic imaging tests, not familiarity with the patient. Given the tests in the record and the requirements of the exclusion to the Other Limited Conditions provision, Standard's reviewing physicians carry the day, whether under a *de novo* standard of review or an arbitrary and capricious standard of review.

In sum, Mr. Zaccone has not provided the kind of evidence the Group Plan mandates. Again, this is not to say that he is not suffering pain or is not disabled under other definitions of disability. It is just to say that, under the Group Plan, he is not entitled to any more than twelve months of benefits, which he has already received.

## CONCLUSION

It must not be forgotten that the issue in this and like cases is not like that which often occurs in a Social Security disability case, where an ALJ ignores allegations of severe pain solely because they are not supported by significant diagnostic tests. That is improper. *See Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014). Rather, Here, the issue is whether the applicant has provided the evidence explicitly and unambiguously required by the Policy, and that is a "matter[ ] of contract." *Hawkins v. First Union Corporation Long-Term Disability Plan,* 326 F.3d at 917. If the applicant has not submitted such proof, he cannot prevail. That is the position in which Mr.

Zaccone unfortunately finds himself. The plaintiff's motion for judgment [Dkt. # 87] is DENIED, and the defendant's motion for judgment [Dkt. # 90] is GRANTED.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 5/2/14